1  BEING RIGHT ON HER?

2  A.   NO.  NO; I DON'T THINK SO.

3  Q.   SO IT'S YOUR TESTIMONY THAT YOU DID NOT BELIEVE THAT YOU

4  WERE BLOCKING HER IN ANY WAY?

5  A.   NO, I DON'T THINK SO, BECAUSE I RECALL LIKE WALKING, NOT A

6  GREAT DISTANCE, BUT I REMEMBER WALKING UP TO THE VEHICLE; SO

7  THAT INDICATES TO ME THAT I WAS -- THAT I HAD PARKED, LIKE I

8  SAID, 20 FEET AWAY.

9  Q.   DID YOU RADIO INTO DISPATCH THAT YOU WERE INVESTIGATING

10  THIS CAR?

11  A.   YES.

12  Q.   RIGHT AT THE TIME THAT YOU EXITED THE VEHICLE?

13  A.   PROBABLY.  YOU KNOW -- PROBABLY PRIOR TO -- THAT, I CAN'T

14  RECALL, WHETHER I RADIOED BEFORE OR WHEN I MADE CONTACT.

15  Q.   ISN'T IT TRUE THAT YOU DIDN'T ACTUALLY -- WELL, WHEN YOU

16  RADIOED IN THE CAR, YOU CALLED IN A LICENSE PLATE, RIGHT?

17  A.   YES.

18  Q.   IS THAT FAIR TO SAY?

19  A.   THAT'S FAIR.

20  Q.   WHEN IS THE FIRST TIME YOU SAW THE LICENSE PLATE?

21  A.   ON THE DASH.

22  Q.   SO IT'S YOUR RECOLLECTION THAT YOU SAW THAT FRONT LICENSE

23  PLATE SITTING ON THE DASHBOARD?

24  A.   NO.  NO.  REPHRASE THE QUESTION.

25  Q.   IT'S YOUR TESTIMONY THAT -- YOU'RE TESTIFY NOW THAT YOU SAW

1  THE FRONT LICENSE PLATE SITTING ON THE DASHBOARD?

2  A.   AT SOME POINT OF THIS CONTACT, CORRECT.

3  Q.   AT SOME POINT.  WHAT POINT DID YOU SEE IT?

4  A.   WHEN I MADE CONTACT WITH THE OCCUPANTS WHEN I WAS AT THE

5  CAR.

6  Q.   AND YOU WROTE A REPORT IN THIS CASE?

7  A.   CORRECT.

8  Q.   YOU SIGNED THAT REPORT?

9  A.   I DID.

10        MS. FALK:  YOUR HONOR, I'D LIKE TO MARK FOR

11 IDENTIFICATION DEFENSE EXHIBIT B.

12        THE COURT:  HAND IT UP.

13        MS.  FALK:  I HAVE COPIES FOR EVERYBODY.  I HAVE A COPY

14 FOR THE COURT.

15 BY MS. FALK:

16 Q.   YOU HAVE BEEN ON THE FORCE FOR 18 YEARS?

17 A.   CORRECT.

18 Q.   AND YOU HAVE RECEIVED EXTENSIVE TRAINING AS PART OF YOUR

19 TENURE, I IMAGINE?

20 A.   CORRECT.

21 Q.   AND YOU UNDERSTAND, BECAUSE YOU HAVE MADE SO MANY ARRESTS,

22 THAT IT'S VERY IMPORTANT THAT YOUR REPORTS BE TRUTHFUL?

23 A.   CORRECT.

24 Q.   AND THAT YOUR REPORTS BE ACCURATE?

25 A.   CORRECT.

1  Q.    YOU WROTE THIS REPORT IN THIS CASE ON MARCH 18, 2007,

2  RIGHT?

3  A.    THAT'S CORRECT.

4  Q.    THIS IS YOUR SIGNATURE THERE ON THE BOTTOM OF PAGE TWO OF

5  DEFENSE EXHIBIT B?

6  A.    YES.

7  Q.    SO YOU WROTE THIS REPORT WHEN THE INCIDENT WAS FRESH IN

8  YOUR MIND, RIGHT?

9  A.    YES.

10  Q.    MUCH FRESHER THAN IT IS TODAY?

11  A.    RIGHT.

12  Q.    AND YET IN THIS REPORT YOU DIDN'T WRITE ANYTHING ANYWHERE

13  ABOUT HAVING SEEN THAT LICENSE PLATE ON THE FRONT DASHBOARD.

14  A.    MY ONLY RECALL THAT IS IN THE REPORT IS THAT I OBSERVED A

15  1986 TOYOTA SEDAN PARKED WEST OF CRISSY FIELD RESTROOM WITH NO

16  FRONT PLATE, AS REQUIRED BY THE VEHICLE CODE.    OTHER THAN THAT,

17  NO.

18  Q.    SO YOU DIDN'T WRITE ABOUT SEEING THE LICENSE PLATE ON THE

19  FRONT DASHBOARD IN THIS REPORT?

20  A.    NO, BECAUSE THIS REPORT -- THIS CASE QUICKLY WENT FROM A NO

21  FRONT TAG TO A NARCOTICS CASE, AND SO THE LOCATION AND THE FACT

22  OF THE LOCATION OF THE HEROIN WAS MORE -- WELL -- AS FAR AS ANY

23  REPORT -- WAS MORE IMPORTANT THAN THAT.

24  Q.    SO YOU OMITTED THAT INFORMATION BECAUSE YOU DIDN'T THINK IT

25  WAS IMPORTANT?

```
 1  A.    I MAY HAVE OMITTED IT.  I DON'T THINK THAT I DIDN'T THINK
 2  IT WAS IMPORTANT.
 3  Q.    YOU DID ISSUE A CITATION FOR MISS MAYS FOR NOT HAVING A
 4  LICENSE PLATE DISPLAYED, RIGHT?
 5  A.    YES.
 6  Q.    DID YOU REVIEW THIS REPORT PRIOR TO TESTIFYING?
 7  A.    YES.
 8  Q.    IS IT FAIR TO SAY THAT OTHER THAN READING YOUR REPORT, YOU
 9  DON'T HAVE A VERY CLEAR MEMORY  OFWHAT WENT ON THAT DAY?
10         MS. WANG:  OBJECTION.
11         THE COURT:  WHAT'S THE OBJECTION?
12         MS. WANG:  ARGUMENTATIVE.
13         THE COURT:  OVERRULED.
14         THE WITNESS:  I MAKE A LOT OF CONTACTS, YOU KNOW.  THIS
15  WAS SEVERAL MONTHS AGO.  SO, YES, ONCE I WRITE A REPORT, UNLESS
16  IT'S SOMETHING SIGNIFICANT THAT WOULD STAND OUT AS A CASE, AND I
17  WOULDN'T PUT THIS IN THAT ARENA.  IT WAS A COMMON CONTACT FOR
18  ME.
19  BY MS. FALK:
20  Q.    YOU MEAN THIS WHOLE INCIDENT?
21  A.    CORRECT.
22  Q.    SO YOU DON'T HAVE A VERY CLEAR RECOLLECTION OF WHAT WENT ON
23  THAT DAY OTHER THAN WHAT YOU WROTE IN THE REPORT?
24  A.    RIGHT.  OTHER THAN WHAT I HAVE DOCUMENTED IN THIS REPORT.
25  Q.    SO WHEN YOU GOT OUT OF THE CAR -- AND YOU REALLY DON'T
```

1  REMEMBER HOW FAR AWAY YOU WERE PARKED, DO YOU?

2  A.   NO.

3  Q.   OKAY.  SO AFTER YOU GOT OUT OF THE CAR AND YOU WALKED

4  TOWARDS THE CAR, WHAT SPECIFICALLY DID YOU SEE THE PASSENGER,

5  MISS BENZON, DO?

6  A.   AFTER SHE -- CLEARLY, SHE MADE CONTACT WITH ME AND I MADE

7  CONTACT WITH HER, SHE JUST BENT AT THE WAIST IN A WAY AND DOVE

8  DOWN TO WHERE I COULD BARELY SEE HER BACK OR TOP OF HER HEAD,

9  BECAUSE SHE WENT WAY DOWN LOW BEHIND THE DOOR PANEL.  THE CAR

10 PANEL IS MAYBE IN THIS AREA.  SHE DOVE DOWN REAL QUICKLY AND

11 SWIFTLY AND, AGAIN, A VERY EVASIVE MANEUVER, IN MY OPINION.

12 AGAIN, THIS IS NOT NORMAL BEHAVIOR IN MY EXPERIENCE OF 18 YEARS.

13 IF THEY DO, IT'S BECAUSE THEY'RE TRYING TO CONCEAL SOMETHING

14 FROM A POLLICE OFFICER.  THAT'S 99, 100 PERCENT OF THE TIME,

15 PEOPLE DO THAT TRYING TO CONCEAL SOMETHING FROM THEM.

16 Q.   SO YOU WERE STILL APPROACHING THE CAR?

17 A.   YES.

18 Q.   BUT YET YOU JUST TESTIFIED YOU SAW HER TURN AT HER WAIST?.

19 A.   JUST TURN IN HER SEAT LIKE AN ATTEMPT TO TURN, LIKE TURN

20 HER BACK TO ME, AND THEN DIVED DOWN LIKE THAT.

21 Q.   SO AS IF SOMEBODY WAS BENDING DOWN TO SCRATCH THEIR ANKLE?

22 A.   I GUESS IT SERVES THE PURPOSE.

23 Q.   OR BENDING DOWN TO RETRIEVE SOMETHING, RIGHT?

24 A.   RIGHT.

25 Q.   JUST TURNING AT THE WAIST AND BENDING DOWN?

1  A.    A LITTLE MORE QUICKLY.  QUICKER THAN THAT.

2  Q.    AND YOU WOULD AGREE THAT THERE IS LOTS OF INNOCENT

3  EXPLANATIONS FOR WHY SOMEBODY WOULD DO THAT.

4  A.    IN SOME CASES, I GUESS.

5  Q.    YOU AGREE?

6  A.    YES.

7  Q.    SO YOUR INITIAL APPROACH WAS TO THE PASSENGER SIDE OF THE

8  CAR?

9  A.    CORRECT.

10  Q.    WAS THE WINDOW UP OR DOWN?

11  A.    I'M LEANING TOWARDS IT WAS DOWN, BUT I CAN'T RECALL.

12  Q.    SO YOU REALLY DON'T REMEMBER?

13  A.    I DON'T REMEMBER.

14  Q.    NOW, YOU LEANED YOUR HEAD INTO THE WINDOW TO TALK TO THE

15  OCCUPANT OF THE CAR?

16  A.    YES.

17  Q.    WHAT DID YOU ASK?

18  A.    I DON'T BELIEVE I ASKED ANYTHING.  I THINK THEY FIRST MADE

19  CONTACT WITH ME, VERBAL CONTACT WITH ME, ASKED ME A QUESTION.

20  Q.    SO WAS THAT -- AND YOU'RE REFERRING TO THE QUESTION ABOUT

21  THE PARKING ON THE GRASS?

22  A.    CORRECT.

23  Q.    AND DID YOU ASK ANY PASSENGERS ANYTHING AT THAT POINT?

24  A.    NOT THAT I RECALL.  I MEAN, AFTER WE ESTABLISHED THAT THEY

25  COULD PARK THERE AND THAT I MENTIONED ABOUT THE FRONT PLATE NOT

1  BEING PERMANENTLY AFFIXED TO THE FRONT END, IS WHEN I SAW THE

2  STUFF, THE BOTTLE CAP AND BIG LIGHTER ON THE DASHBOARD.  THAT'S

3  WHEN I ASKED THE FRONT SEAT PASSENGER TO STEP OUT OF THE

4  VEHICLE.

5  Q.    THAT WAS A PLASTIC BOTTLE CAP?

6  A.    I HAVE TO REFRESH MY MEMORY.  I DON'T RECALL.

7  Q.    WOULD IT ASSIST YOUR TESTIMONY TO LOOK AT YOUR REPORT TO

8  REFRESH YOUR RECOLLECTION --

9  A.    YES.

10  Q.    - ABOUT THE MATERIAL THAT BOTTLE CAP WAS MADE FROM?

11  A.    YES.

12  Q.    PLEASE DO SO.  DEFENDANT'S EXHIBIT B.

13  A.    OKAY.

14  Q.    IT WAS A PLASTIC BOTTLE CAP?

15  A.    YES.

16  Q.    YOU TESTIFIED YOU SAW A LIGHTER.

17  A.    CORRECT.

18  Q.    YOU WOULD AGREE A LIGHTER IS ALSO USED FOR SMOKING

19  CIGARETTES, RIGHT?

20  A.    YES.

21  Q.    AND THE BOTTLE CAP WAS PLASTIC?

22  A.    YES.

23  Q.    IT WAS YOUR TESTIMONY EARLIER THAT BOTTLE CAPS ARE

24  SOMETIMES USED TO INGEST HEROIN?

25  A.    CORRECT.

1  Q.    AND HOW IS THAT EXACTLY?

2  A.    I DIDN'T SAY "INGEST".  I SAID TO PREPARE TO COOK.

3  Q.    AND WAY IS THAT?

4  A.    BOTTLE CAPS?

5  Q.    YES.

6  A.    BOTTLE CAPS, YOU KNOW, THEY STORE SMALL AMOUNTS OF WATER

7  AND THAT WATER IS USED TO TRANSFER TO SPOONS, SMALL AMOUNT OF

8  WATER INSIDE THE SPOON ALONG WITH THE CONTROLLED SUBSTANCE, HEAT

9  ON THE BOTTOM OF THE SPOON, IT HEATS UP AND DISSOLVES AND MELTS

10  THE SUBSTANCE WHICH IS DISSOLVED AND DILUTED INTO THE WATER AND

11  BROUGHT UP THROUGH A NEEDLE AND PLUNGER AND SYRINGE AND USUALLY

12  THROUGH SOME KIND OF FILTERING DEVISE LIKE A CIGARETTE FILTER,

13  WHICH IS -- AND THAT'S HOW, IF THEY'RE GOING TO USE INTERVENOUS

14  INJECTION.

15  Q.    SO IT'S NOT YOUR TESTIMONY, CERTAINLY, THAT YOU THOUGHT

16  THAT ANYONE WOULD BE USING A LIGHTER ON THIS PLASTIC BOTTLE CAP

17  TO HEAT UP WATER.

18  A.    IN THAT CASE WATER JUST USED AS A STORAGE CONTAINER TO BE

19  USED IN THE COOKING PROCESS.

20  Q.    ISN'T IT ACTUALLY TRUE THAT USUALLY METAL BOTTLE CAPS ARE

21  USED TO ACTUALLY HEAT UP HEROIN?

22  A.    SOME CASES.

23  Q.    BUT THE PLASTIC BOTTLE CAP, THE ONLY CONNECTION THAT YOU'RE

24  SAYING THAT WOULD HAVE HAD TO HEROIN USE IS POURING WATER IN A

25  SPOON?

1  A.    IT'S USED AS A CONVEYANCE TO TRANSPORT SMALL AMOUNTS OF

2  WATER TO THE SPOON OR SOME OTHER COOKING SURFACE, IN THIS CASE,

3  A SPOON.

4  Q.    BUT YOU DIDN'T SEE A SPOON.

5  A.    NOT INITIALLY, NO.

6  Q.    YOU DIDN'T SEE DRUGS?

7  A.    NOT INITIALLY, NO.

8  Q.    YOU JUST SAW A BOTTLE CAP, PLASTIC BOTTLE CAP?

9  A.    WITH A SMALL AMOUNT OF WATER.

10  Q.    IT WASN'T BURNT, RIGHT?

11  A.    CORRECT.

12  Q.    IT DIDN'T LOOK MELTED?

13  A.    CORRECT.

14  Q.    DID YOU SEE THOSE ITEMS BEFORE YOU ASKED MISS BENZON TO GET

15  OUT OF THE CAR?

16  A.    NO.  I DIDN'T FEEL LIKE I SHOULD REACH IN THE VEHICLE.

17  Q.    DID YOU ASK WHOSE ITEMS THOSE WERE?

18  A.    NO; I DID NOT.

19  Q.    DID YOU ASK WHOSE CAR IT WAS?

20  A.    I MAY HAVE.

21  Q.    DO YOU RECALL GETTING AN ANSWER?

22  A.    NO.  I MEAN, I DON'T RECALL ASKING THAT QUESTION, BUT

23  THAT'S A QUESTION THAT I POSSIBLY COULD HAVE ASKED.

24  Q.    BUT YOU DON'T RECALL ASKING IT?

25  A.    NO.

1  Q.    DO YOU RECALL ASKING ABOUT WHETHER THERE WAS ALCOHOL IN THE

2  CAR?

3  A.    NO, I DO NOT.

4  Q.    SO YOU ASKED MISS BENZON TO STEP OUT OF THE CAR?

5  A.    THAT IS CORRECT.

6  Q.    DID YOU OPEN THE CAR DOOR?

7  A.    I MAY HAVE.

8  Q.    AND YOU TOLD HER TO GET OUT OF THE CAR?

9  A.    YES.

10 Q.    AND YOU PROCEEDED TO SEARCH THE CAR?

11 A.    WELL, THE SPOON WAS ON VIEW.  I DIDN'T PHYSICALLY HAVE A

12 CHANCE TO -- I SAW IT -- ONCE SHE REMOVED FROM THE SEAT, SHE GOT

13 OUT OF THE SEAT, I SAW IT.

14 Q.    WHERE DID YOU SEE IT?

15 A.    THE FRONT SEAT.

16 Q.    UNDERNEATH HER?

17 A.    WHERE SHE WAS SEATED, YES.  IT WOULD BE UNDER HER, LIKE

18 MAYBE HER LEFT LEG.

19 Q.    YOU TESTIFIED YOU ALSO FOUND A SMALL AMOUNT OF HEROIN?

20 A.    CORRECT.

21 Q.    AND YOU FOUND THAT IN A WALGREENS BAG?

22 A.    NO.  NO. LIKE A LITTLE -- SPECIALLY IN NORTHERN CALIFORNIA,

23 IT IS TRANSPORTED AND SOLD IN LITTLE BINDLES, MAYBE HALF THE

24 SIZE OF A PEANUT, WRAPPED IN SOME, LIKE A KIND OF CELLOPHANE

25 KIND OF SUBSTANCE, AND THEN TWISTED AND CUT OFF OR BROKEN OFF.

1  THAT'S HOW IT'S STORED.

2  Q.  SO IT YOUR TESTIMONY IT WAS IN A CLEAR --

3  A.  CLEAR PLASTIC BAG, CELLOPHANE-LIKE SUBSTANCE.

4  Q.  YOU FOUND IT ON THE SEAT WHERE MISS BENZON WAS SITTING?

5  A.  RIGHT.

6  Q.  NOW, YOU MADE OBSERVATIONS OF THE PASSENGERS DURING THIS

7  PROCESS?

8  A.  YES.  WELL, AT WHAT POINT IN THE PROCESS?

9  Q.  WELL, CERTAINLY WHEN YOU LEANED INTO THE CAR, IN THE

10  PASSENGER SIDE OF THE CAR.  AND YOU WERE LOOKING AT THE

11  PASSENGERS, RIGHT?

12  A.  RIGHT.

13  Q.  DID ANY OF THEM APPEAR TO BE UNDER THE INFLUENCE?

14  A.  NO.

15  Q.  DID MISS MAYS APPEAR TO BE UNDER THE INFLUENCE?

16  A.  NO.

17  Q.  AND OTHER THAN THE BOTTLE CAP AND THE LIGHTER, DID YOU SEE

18  ANY OTHER CONTRABAND BEFORE YOU ORDERED MISS BENZON OUT OF THE

19  CAR?

20  A.  NO.  OTHER THAN THE FIRTIVE MOVEMENT BY THE INDIVIDUAL, NO

21  OTHER CONTACT.

22  Q.  NOW, YOU DIDN'T ARREST MISS BENZON AND MR. MC NATT, DID

23  YOU?

24  A.  NO.

25  Q.  I BELIEVE YOU TESTIFIED ON DIRECT THAT YOU HAD A

1  COMVERSATION WITH MISS MAYS ABOUT POSSESSING A CONTROLLED

2  SUBSTANCE?

3  A.   YES.   I THINK I WAS TRYING TO -- SHE WAS VERY UPSET.   I WAS

4  TRYING TO ASSURE HER THAT THIS WAS NOT THE END OF THE WORLD.

5  Q.   DID SHE MAKE FURTHER ADMISSIONS TO YOU ABOUT HAVING

6  POSSESSED IT?

7  A.   NOT THAT I RECALL.

8  Q.   YOU DIDN'T IMPOUND THIS CAR, DID YOU?

9  A.   COULD HAVE, BUT DID NOT.

10  Q.   YOU DIDN'T HAVE IT TOWED?

11  A.   I DID NOT.

12  Q.   AND YOU DIDN'T TAKE ANY PHOTOGRAPHS OF THE CAR, RIGHT?

13  A.   NO; I DID NOT.

14  Q.   YOU DIDN'T TAKE ANY PHOTOGRAPHS OF THE FRONT PART OF THE

15  CAR?

16  A.   I DID NOT.

17  Q.   IN FACT, YOU ACTUALLY JUST RELEASED THE CAR TO MR. MC NATT?

18  A.   WITH THE PERMISSION OF THE DEFENDANT, CORRECT.

19  Q.   THERE WAS ANOTHER OFFICER WHO WHO RESPONDED TO THE SCENE?

20  A.   YES.

21  Q.   WHAT OFFICER?

22  A.   ROBERT WHALEN.

23  Q.   SPELL THAT.

24  A.   R-O-B-E-R-T.  W-H-E-L-A-N.

25  Q.   HE ARRIVED IN A SPORTS UTILITY VEHICLE?

1  A.    YES, I GUESS SO.

2  Q.    DO YOU RECALL THAT?

3  A.    I MEAN, HE'S AN I.D. TECH.  THAT'S WHAT THEY DRIVE.  AGAIN,

4  I DON'T KNOW WHAT HE ACTUALLY DROVE THAT DAY.  I WOULD BE

5  ASSUMING, BUT THAT'S THE VEHICLE ASSIGNED TO THEM.

6  Q.    YOU POINTED OUT THE MISSING FRONT LICENSE PLATE TO HIM?

7  A.    I DON'T KNOW.  I CAN'T RECALL THAT.

8  Q.    SO YOU DON'T REMEMBER IF YOU DID OR NOT?

9  A.    I DOUBT THAT I WOULD.

10  Q.    WHY NOT?

11  A.    HE IS THERE TO CONTROL ADDITIONAL PRISONERS OR TO MAYBE

12  POTENTIALLY SEARCH A VEHICLE FOR ADDITIONAL CONTRABAND, ASSIST

13  IN THOSE KINDS OF WAYS.  IT'S -- THAT'S NOT WHAT -- I DON'T

14  THINK I WOULD HAVE GONE OUT SPECIFICALLY POINTED OUT AN

15  INFRACTION TO ANOTHER OFFICER.

16  Q.    WELL, BUT YOWROTE ABOUT IT IN YOUR REPORT AS THE BASIS FOR

17  YOUR APPROACHING THIS CAR, RIGHT?

18  A.    RIGHT.

19  Q.    SO IT WAS IMPORTANT ENOUGH FOR YOU TO WRITE IN YOUR REPORT

20  THAT THE CAR IS MISSING A FRONT LICENSE PLATE?

21  A.    RIGHT.

22  Q.    IT'S YOUR TESTIMONY THAT YOU DIDN'T SPECIFICALLY SHOW THE

23  OTHER OFFICER?

24  A.    I AM AN INDIVIDUAL SUPERVISOR.  I AM NOT GOING TO GO OVER A

25  WHOLE CASE ON THE SCENE WHEN THERE IS TWO OTHER INDIVIDUALS THAT

1    ARE NOT HANDCUFFED.   THAT WOULD BE INAPPROPRIATE, IN MY OPINION.

2    Q.    HE IS NOT HERE TODAY?

3    A.    HE IS WORKING TODAY.

4    Q.    HE IS NOT HERE?

5    A.    NOT IN THE COURTROOM.

6    Q.    HE IS NOT HERE TO TESTIFY TODAY?

7    A.    NO.

8         MS. FALK:   THANK YOU, OFFICER.   NO FURTHER QUESTION

9    QUESTIONS.

10         THE COURT:   MS. WANG.

11         MS. WANG:   BRIEFLY.

12                     REDIRECT EXAMINATION

13   BY MS. WANG:

14   Q.    YOU INDICATED ON CROSS THAT -- I THINK IT'S DEFENSE EXHIBIT

15   A, WHERE THE STAR IS WHERE YOU DECIDED TO APPROACH THE VEHICLE,

16   THAT IT WAS YOR INTENT TO HAVE A CONSENSUAL ENCOUNTER WITH THE

17   OCCUPANTS?

18   A.    YES.   AGAIN, THIS IS THE BEST OF MY RECALL.   AFTER I

19   WATCHED THE BEHAVIOR OF THE OCCUPANTS OF THE VEHICLE, IT JUST

20   RILED MY SUSPICION.   I MADE A TURN TO MAKE ANOTHER PASS TO SEE

21   IF THIS CONDUCT CONTINUED, IS WHEN WOULD BE MY FIRST SIGHT OF

22   THE FRONT END OF THE CAR.

23   Q.    SO AT THAT POINT WHERE THE STAR IS WHERE YOU DECIDED TO

24   APPROACH THE VEHICLE, YOU HAD NO INTENTION OF ARRESTING THE

25   OCCUPANTS, CORRECT?

1  A.    NO.

2  Q.    AND YOU HAD NO INTENTION OF SEARCHING THAT VEHICLE, JUST

3  GOING TO HAVE A CONSENSUAL ENCOUNTER?

4  A.    THAT'S RIGHT.

5  Q.    THENWHERE THE SECOND STAR IS CIRCLED ON DEFENSE A, YOU

6  NOTICED THAT THERE WAS NO FRONT LICENSE PLATE?

7  A.    AGAIN, YOU KNOW, AT SOME POINT, NOT PRECISELY THERE.

8  AGAIN, AS I SAID, SOMEWHERE IN THAT AREA IS WHEN I HAD A FULL-ON

9  VIEW OF THE VEHICLE, AND THAT WOULD BE MY TIME THAT I MADE -- I

10 OBSERVED THAT THE VEHICLE DIDN'T HAE AFFIXED FRONT TAGS.

11         THE COURT:  LET ME INTERJECT A QUESTION SO YOU HAVE

12 TIME TO FOLLOW-UP.  HOW IS IT THAT IF YOU GENERALLY DON'T

13 REMEMBER ANYTHING THAT IS NOT IN THE REPORT AND THE REPORT

14 DOESN'T MENTION THAT IN FACT THE LICENSE -- THERE WAS A LICENSE

15 PLATE, BUT IT WAS ON THE DASHBOARD, AS OPPOSED TO AFFIXED TO THE

16 FRONT, THAT YOU REMEMBER THAT?

17         THE WITNESS:  BECAUSE, MA'AM, I RECALL, I BELIEVE

18 SEEING IT AFTER IT WAS BROUGHT TO MY ATTENTION.  MAYBE THE

19 OCCUPANTS BROUGHT IT TO MY ATTENTION THAT IT WAS ON THE

20 DASHBOARD.

21         THE COURT:  YOU RECALL THAT EVEN THOUGH YOU DIDN'T PUT

22 IT IN THE REPORT?

23           THE WITNESS: YES.

24         THE COURT:  WHAT DO YOU THINK ENABLES YOU TO RECALL

25 THAT AS OPPOSED TO OTHER THINGS IN THE REPORT?

1        THE WITNESS:  NOTHING IN PARTICULAR.  I DON'T HAVE A

2  REASON FOR THAT, JUST IS IN MY MEMORY.

3                REDIRECT EXAMINATION (RESUMED)

4  BY MS. WANG:

5  Q.    WHEN YOU APPROACHED THE VEHICLE, WHEN YOU ACTUALLY, ON

6  FOOT, WENT TO APPROACH THE VEHICLE, YOU HAD ALREADY OBSERVED THE

7  VIOLATION OF THE VEHICLE CODE.  IS THAT CORRECT?

8  A.    CORRECT.

9  Q.    AND YOUR REPORT SAYS THAT NO TAG WAS DISPLAYED, AS REQUIRED

10 BY CALIFORNIA VEHICLE CODE SECTION 5200(A).  IS HAVING A LICENSE

11 PLATE DISPLAYED ON THE DASHBOARD A VIOLATION OF THAT VEHICLE

12 CODE SECTION?

13 A.    YES, 5200(A), IT'S GOT TO BE PERMANENTLY AFFIXED TO THE

14 FRONT OF THE VEHICLE, AND HAVING IT LOOSE ON THE DASHBOARD IS

15 NOT ADEQUATE.

16 Q.    SO DOES IT MAKE A DIFFERENCE WHETHER THE PLATE WAS

17 DISPLAYED ON THE DASHBOARD OR IS NOT DISPLAYED AT ALL?

18        THE COURT:  WHAT DO YOU MEAN?  WHAT KIND OF A

19 DIFFERENCE? YOU MEAN FROM A VIOLATION POINT OF VIEW?

20 BY MS. WANG:

21 Q.    WOULD IT STILL HAVE BEEN A VIOLATION OF THE VEHICLE CODE

22 WHETHER THE LICENSE PLATE WAS DISPLAYED ON THE DASHBOARD OR

23 DISPLAYED ANYWHERE ELSE, OR IS IT JUST THAT IF A LICENSE PLATE

24 IS NOT AFFIXED TO THE FRONT OF THE VEHICLE, THAT IS A VEHICLE

25 CODE VIOLATION?

1  A.   IT'S STILL A VIOLATION.

2  Q.   SO IS IT FAIR TO SAY WHETHER OR NOT YOU SAW THE LICENSE

3  PLATE ON THE DASHBOARD, YOU STILL WOULD HAVE APPROACHED THE

4  VEHICLE BECAUSE THERE IT WAS IN VIOLATION OF THE VEHICLE CODE?

5  A.   YES.

6  Q.   WAS THE VEHICLE BLOCKED FROM MOVING, BY YOUR VEHICLE?

7  A.   NO.

8  Q.   WAS MISS MAYS' VEHICLE BLOCKED BY ANY OTHER VEHICLES?

9  A.   THERE WAS OTHER CARS IN THE AREA.  CRISSY FIELD IS A --

10 USUALLY WHEN YOU MAKE CONTACT WITH PARKED VEHICLES, THEY'RE

11 USUALLY IN PARKING LOTS WITH THE ASSIGNED STALLS AND LINES

12 THERE.  THAT'S WHY MY RECALL WHERE EXACTLY IT WAS -- USUALLY

13 IT'S IN A DESIGNED PARKING AREA.  USUALLY APPROACHED BY THE

14 REAR.  SO FAR AS CARS, THERE WAS OTHER CARS IN THE AREA, AND I

15 KNOW THERE WASN'T ANY CARS BEHIND THEM OR IN FRONT.  THERE MAY

16 HAVE BEEN CARS TO THE WEST.

17 Q.   WHEN YOU SAW THE PASSENGER BEND AT THE WAIST, WAS THAT

18 IMMEDIATELY AFTER YOU NOTICED HER MAKING CONTACT WITH YOU?

19 A.   YES.

20 Q.   WHY DID IT APPEAR TO YOU SHE WAS CONCEALING SOMETHING FROM

21 YOU AS OPPOSED TO SCRATCHING HER ANKLE?

22 A.   AGAIN, THIS WAS AFTER MAKING EYE CONTACT WITH ME AND, IN MY

23 OPINION, REALIZING I WAS A POLICEMAN WALKING TOWARDS HER CAR,

24 AND IT WAS DELIBERATE AND FAST.  IT WASN'T IN A SUTTLE -- WHEN I

25 GO TO SCRATCH MY ANKLE, I JUST KIND OF AY BEND DOWN CASUALLY.

1    IT WAS MORE QUICKLY, QUICKER NATURE.

2    Q.    DID THE BOTTLE CAP YOU OBSERVED IN THE DASHBOARD, WAS IT

3    EMPTY OR FULL OF WATER?

4    A.    WELL, I WOULDN'T SAY FILLED.   IT CONTAINED SOME WATER.

5    Q.    IN YOUR EXPERIENCE WITH NARCOTICS AND NARCOTICS CASES, HAVE

6    YOU SEEN A PLASTIC BOTTLE CAP USED TO STORE WATER THAT WOULD

7    THEN BE USED TO COOK HEROIN?

8    A.    ABSOLUTELY.

9    Q.    FREQUENTLY?

10   A.    FREQUENTLY.

11   Q.    TO YOUR KNOWLEDGE, MISS MAYS WAS NOT THE REGISTERED OWNER

12   OF THE CAR; IS THAT RIGHT?

13   A.    THAT'S CORRECT.

14         MS. WANG:  NOTHING FURTHER.

15         THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

16         MS. FALLK:  NOTHING FURTHER.

17         THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

18         ALL RIGHT.  THIS CONCLUDES YOUR WITNESSES?

19         MS. WANG:  YES, YOUR HONOR.

20         THE COURT:  WOULD YOU CALL YOUR FIRST WITNESS.  IS THE

21   DEFENDANT GOING TO TESTIFY?

22         MS. FALK:  I BELIEVE SO.

23         I MOVE FOR ADMISSION OF DEFENSE EXHIBIT A.

24         THE COURT:  I THINK IT'S ALREADY BEEN ADMITTED.

25         MS. FALK:  FOR THE PURPOSE OF NOT TAINTING THE WITNESS,

```
 1  I AM JUST GOING TO --
 2          THE COURT:  PLEASE COME UP AND HAVE A SEAT,
 3  MISS BENZON.
 4          THE CLERK:  YOU DO SOLEMNLY SWEAR THAT THE TESTIMONY
 5  YOU SHALL GIVE IN THE MATTER NOW PENDING BEFORE THIS COURT,
 6  SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH,
 7  SO HELP YOU GOD.
 8          THE WITNESS:  UH-HUH.
 9                        JENNY LOUISE BENZON,
10  CALLED AS A WITNESS BY THE DEFENSE, HAVING BEEN DULY SWORN,
11  TESTIFIED AS FOLLOWS:
12          THE CLERK:  STATE YOUR FULL NAME AND SPELL YOUR LAST.
13          THE WITNESS:  JENNY LOUISE BENZON.
14                      DIRECT EXAMINATION
15  BY MS. FALK:
16  Q.  MISS BENZON, WHERE DO YOU LIVE?
17  A.  SONOMA.
18  Q.  HOW LONG HAVE YOU YOU LIVED THERE?
19  A.  LIKE EIGHT MONTHS THIS TIME, BUT OFF AND ON, MY WHOLE LIFE.
20  Q.  WERE YOU BORN THERE?
21  A.  YES.
22  Q.  ARE YOU A NATIVE OF THE BAY AREA?
23  A.  YES.
24  Q.  HOW DO YOU KNOW NICOLE MAYS?
25  A.  JUST HAVE BEEN FRIENDS OVER THE YEARS OFF AND ON.
```

```
 1  Q.    ARE YOU CURRENTLY CLOSE FRIENDS?

 2  A.    NO.

 3  Q.    AND HAVE YOU SEEN MISS MAYS SINCE MARCH OF 2007?

 4  A.    HUH-HUH.

 5  Q.    IS THAT A NO?

 6  A.    NO.  SORRY.

 7  Q.    IT NEEDS TO BE YES OR NO.

 8        IN WHAT CAPACITY HAVE YOU SEEN HER BETWEEN TODAY AND MARCH

 9  2007?

10  A.    I HAVEN'T REALLY SEEN HER.

11  Q.    YOU'VE JUST SEEN HER IN THE STORE SOMETIMES?

12  A.    JUST LIKE ONCE RANDOMLY RAN INTO HER.

13  Q.    HAVE YOU DISCUSS THE FACTS THIS CASE WITH MISS MAYS SINCE

14  SHE WAS CHARGED HERE IN FEDERAL COURT?

15  A.    NO.

16  Q.    HAVE YOU MET WITH HER PRIOR TO TODAY TO DISCUSS YOUR

17  TESTIMONY?

18  A.    NO.

19  Q.    SO TURNING YOUR ATTENTION TO MARCH 18, 2007, WERE YOU IN

20  SAN FRANCISCO ON THAT DATE?

21  A.    YES.

22  Q.    WERE YOU A PASSENGER IN A CAR?

23  A.    YES.

24  Q.    WERE THERE OTHER PASSENGERS?

25  A.    YES.
```

```
 1   Q.   WHO WAS THE OTHER PASSENGER?

 2   A.   OTHER PASSENGER?

 3   Q.   OR PASSENGERS.

 4   A.   NICOLE AND CHRIS.

 5   Q.   WAS ONE OF THOSE THE DRIVER?  WHO WAS DRIVING?

 6   A.   NICOLE.

 7   Q.   DID YOU DRIVE FROM SONOMA TO SAN FRANCISCO WITH BOTH

 8   INDIVIDUALS?

 9   A.   UH-HUM.  YES.

10   Q.   WHAT KIND OF CAR WAS MISS MAYS DRIVING?

11   A.   I THINK IT WAS A TOYOTA.

12   Q.   DID YOU KNOW WHO OWNED THAT CAR?

13   A.   NO.  MAYBE HER BOYFRIEND AT THE TIME, YES.

14   Q.   BUT DID YOU KNOW FOR SURE?

15   A.   NO.

16   Q.   NOW, EVENTUALLY ON MARCH 18, 2007, DID YOU MAKE IT TO

17   CRISSY FIELD IN THAT CAR?

18   A.   YES.

19   Q.   AND DO YOU REMEMBER AROUND WHAT TIME OF DAY?

20   A.   THE MORNING, ALMOST NOON.  THE MORNING.

21   Q.   SORRY.  THIS IS A FOUNDATIONAL QUESTION.  WHAT WAS YOUR

22   RELATIONSHIP, IF ANY, WITH CHRIS MC NATT BACK IN MARCH 18, 2007?

23   A.   MY BOYFRIEND.

24   Q.   BOYFRIEND?

25   A.   YES.
```

1  Q.   NOW, DID YOU PARK IN CRISSY FIELD?

2  A.   YES.

3  Q.   DID MISS MAYS LEAVE THE VEHICLE?

4  A.   YEAH.  TO GO TO THE BATHROOM.

5  Q.   AND DID SHE RETURN TO THE CAR?

6  A.   YES.

7  Q.   NOW, DID YOU NOTICE A POLICE PRESENCE AT SOME POINT AROUND

8  THAT SAME TIME?

9  A.   YES.

10 Q.   WAS IT BEFORE OR AFTER MISS MAYS RETURNED TO THE CAR?

11 A.   HE MIGHT HAVE PULLED UP BEFORE SHE GOT BACK TO THE CAR.  HE

12 DIDN'T COME UP TO THE CAR 'TILL AFTER SHE WAS ALREADY BACK IN

13 THE CAR.

14 Q.   DO YOU REMEMBER WHEN YOU FIRST SAW THE POLICE CAR -- WHERE

15 WAS IT RELATIVE TO WHERE YOU'RE SITTING?  IN OTHER WORDS, WAS IT

16 ON YOUR LEFT OR YOUR RIGHT?  DO YOU RECALL HOW IT CAME INTO YOUR

17 LINE OF VISION?

18 A.   IT WAS IN FRONT OF THE CAR, IN FRONT OF US.

19 Q.   WAS IT ON THE ROAD?

20 A.   NO.

21 Q.   WHERE WAS IT?

22 A.   IN THE GRASS AREA.

23 Q.   DID YOU WATCH -- WAS THE CAR ON THE ROAD BEFORE IT PULLED

24 ON TO THE GRASS?

25 A.   IT WASN'T A POLICE CAR, SO I DIDN'T KNOW THAT IT WAS.  I

1  DON'T REMEMBER.  I DON'T REMEMBER SEEING IT PULL UP.  IT JUST

2  PULLED UP IN FRONT OF US, BLOCKED US SO WE COULDN'T GO FORWARD.

3          MS. FALK:  WITH THE COURT'S PERMISSION, I AM GOING TO

4  ASK MISS BENZON TO DRAW A DIAGRAM.  I WILL ASK THE COURT'S

5  PERMISSION TO MARK THAT AS DEFENSE EXHIBIT C, INDICATING THE

6  LOCATION OF MISS MAYS' CAR AND WHERE MISS BENZON FIRST SAW THE

7  VEHICLE.

8  BY MS. FALK:

9  Q.   MISS BENZON, I'M GOING TO HAND YOU A BLACK MARKER AND, IF

10 YOU COULD, PLEASE, USING THE TOP OF THE PAGE AS THE NORTHERN

11 ORIENTATION, WHERE THE WATER IS, AND THE BOTTOM IS SOUTH, THE

12 LEFT-HAND SIDE IS WEST, AND THE RIGHT-HAND IS EAST, IF YOU CAN

13 DRAW WHERE THE CAR WAS FACING AND MARK THAT WITH AN "M".

14 A.   THE POLICE CAR, OR OUR CAR?

15 Q.   YOURS.

16 A.   OUR CAR WAS FACING THIS WAY.

17 Q.   NORTH?

18 A.   YES.

19 Q.   CAN YOU DRAW A BOX AROUND THE "M"?

20          (THE WITNESS COMPLIES WITH COUNSEL'S REQUEST.)

21      NOW, CAN YOU PLEASE MARK, WITH A STAR, WHERE YOU FIRST

22 NOTICED THE POLICE CAR.  WHERE DID THE POLICE CAR COME TO REST?

23 A.   RIGHT THERE.  AS IT PULLED UP, HERE IS THE ROAD.

24 Q.   THIS IS WHAT I WANT YOU TO DRAW.  WHERE DID IT APPROACH

25 FROM AND WHERE DID IT PULL UP?

1  A.    I THINK HE CAME FROM AROUND THIS WAY AND PULLED IN THIS

2  WAY.

3  Q.    CAN YOU DRAW THAT WITH A BLACK MARKER.

4  A.    LIKE THAT WAY.

5  Q.    SO INDICATING, FOR THE RECORD, THAT THE POLICE CAR CAME

6  FROM THE NORTH AND PROCEEDED SOUTH.

7  A.    I THINK SO.

8  Q.    CAN YOU DRAW A BOX AND MARK IT WITH A "P".

9        IN WHAT DIRECTION WAS THAT POLICE CAR PARKED?

10 A.    LIKE --

11 Q.    CAN YOU DRAW WITH A RECTANGLE WHERE IT WAS FACING, WHERE

12 THE ORIENTATION OF THE CAR WAS?

13 A.    OKAY.  IT WAS PARKED LIKE RIGHT -- I GUESS THIS IS WHERE

14 THE CAR WAS, RIGHT HERE IN FRONT OF US.  HERE IS US.  HERE IS

15 THE CAR.

16 Q.    WHICH DIRECTION WAS THE POLICE CAR FACING?  WHERE WAS THE

17 FRONT OF THE CAR?

18 A.    OVER HERE.

19 Q.    CAN YOU INDICATE WITH AN ARROW WHAT DIRECTION THE CAR WAS

20 FACING?

21 A.    THAT WAY.

22 Q.    THANK YOU.  YOU CAN RETURN TO THE STAND, PLEASE.

23        HOW CLOSE WAS THE POLICE CAR TO MISS MAYS' CAR?

24 A.    LIKE REALLY CLOSE RIGHT THERE.  I MEAN  -- WE COULDN'T --

25 IT WAS PARKED REALLY CLOSE TO US, I GUESS.

```
 1  Q.   WAS THERE A COUPLE OF FEET BETWEEN YOU AND THE CAR?

 2  A.   PROBABLY.  I GUESS MAYBE LIKE FROM HERE TO THERE.

 3  Q.   YOU'RE SAYING  --

 4  A.   ME TO THE BEGINNING OF THAT DESK, YES.

 5  Q.   SO ESTIMATING, FOR THE RECORD, APPROXIMATELY FIVE TO SIX

 6  FEET.  IS THAT FAIR?

 7  A.   YEAH.  IT WAS CLOSE TO US.

 8        THE COURT:  HOW CERTAIN ARE YOU THAT THE CAR APROACHED

 9  THE WAY YOU DREW, WHEN YOU SAID YOU THINK IT APPROACHED?

10        THE WITNESS:  I'M PRETTY SURE IT CAME UP THAT WAY AND

11  PULLED IN.

12  BY MS. FALK:

13  Q.   LET ME CLARIFY THE QUESTION.  DID YOU EVER SEE THE CAR FROM

14  THE WEST?  DID YOU EVER SEE THE CAR DRIVING FROM THE WEST UP TO

15  THE NORTH, AND THEN DOWN?

16  A.   NO.

17  Q.   YOU DID NOT SEE THE CAR ON THE ROAD?

18  A.   NO.

19  Q.   DID YOU SEE THE CAR, THE POLICE CAR, IN THE NORTHERN ROAD?

20  A.   NO.

21  Q.   SO BY THE TIME YOU SAW THE CAR, WAS IT DRIVING TOWARDS YOU?

22  A.   YES.

23  Q.   NOW, AT THAT POINT DID YOU WATCH THE POLICE CAR, THE CAR?

24  A.   KIND OF.  KIND OF CONCERNED -- I MEAN -- HE GOT OUT OF HIS

25  CAR PRETTY QUICK, CAME RIGHT OVER TO US.
```